IN THE COURT OF COMMON PLEAS
MEDINA COUNTY, OHIO

| | |
|---|---|
| **LUAN O'CONNOR**<br>111 W. Reagan Pkwy.<br>Medina, OH 44256<br><br>Plaintiff<br><br>v.<br><br>**ZELTIQ AESTHETICS, INC.**<br>4698 Willow Road<br>Pleasanton, CA 94588<br><br>Defendant | CASE NO.<br><br>JUDGE **15CIV0984**<br>CHRISTOPHER J. COLLIER, JUDGE<br><br>**PLAINTIFF'S ORIGINAL COMPLAINT<br>AND JURY DEMAND**<br><br>OTHER CIVIL: |

COMMON PLEAS COURT
'15 SEP 24 PM 3:38
DAVID B. WADSWORTH
MEDINA COUNTY
CLERK OF COURTS

NOW COMES Plaintiff, Luan O'Connor, by and through counsel, and submits the following as her Complaint against Zeltiq Aesthetics, Inc.

### PARTIES

1. At all times relevant to this Complaint, Plaintiff, Luan O'Connor (Plaintiff), is a doctor conducting business at 111 W. Reagan Pkwy. in Medina, Ohio.

2. At all times relevant to this Complaint, Defendant, Zeltiq Aesthetics, Inc., (Defendant) is a company with its principle place of business at 4698 Willow Rd. in Pleasanton, California.

### JURISDICTION AND VENUE

3. Jurisdiction and venue are proper in this court under Rev. C. 2307.382(A)(1), (A)(2), and (A)(4) due to Defendant conducting business in the State of Ohio. The business Defendant conducted in Ohio is the direct cause of this action.

## FACTUAL BACKGROUND

4. On or about October 28, 2014, Defendant sent an agent and a CoolSculpting machine to Plaintiff's place of business.

5. Defendant's agent and Plaintiff began discussing Plaintiff purchasing a CoolSculpting System (the product) from Defendant.

6. Defendant's agent informed Plaintiff that the product could freeze and destroy fat cells as a way to remove excess body fat.

7. Defendant's agent also stated that any pain and/or side effects of the product would be minimal in nature and had only a rare chance of occurring.

8. Plaintiff volunteered to be the first subject in the product at issue.

9. Defendant's agent demonstrated the product on Plaintiff performing the procedure.

10. At the time of the procedure Plaintiff only experienced minimal side effects.

11. On or about October 29, 2014, Plaintiff entered into a sales agreement with Defendant.

12. The subject of the sales agreement was Plaintiff's purchase of the product.

13. After the sales agreement was entered into, Defendant delivered the product to Plaintiff's place of business.

14. Several days after the procedure Plaintiff continuously began experiencing side effects

15. The product caused severe prolonged pain and numbness to Plaintiff and rendered portions of Plaintiff's body permanently numb.

## COUNT ONE – PRODUCTS LIABILITY; REV.C.2307.77

16. Plaintiff incorporates paragraphs 1 -12 as if fully written here.

17. Defendant is a manufacturer as defined und Rev.C.2307.71(A)(12).

18. Defendant made representations that the product was safe and a reliable way to remove excess body fat.

19. Defendant's product did not conform to those representations as Plaintiff's excess body fat and loss was minimal if any and she experienced and continues to endure injuries resulting from the use of the product.

20. Plaintiff justifiably relied on the representations by Defendant.

21. The Defendant's product is the direct and proximate result of Plaintiff's ongoing injuries.

22. Because the product at issue did not conform to representations made by the Defendant and caused injuries to Plaintiff, Plaintiff is entitled to damages.

## COUNT TWO – BREACH OF CONTRACT

23. Plaintiff incorporates paragraphs 1 – 19 as if fully written here.

24. Defendant advertised that the product was an effective way to lose excess body fat.

25. Furthermore, Defendant's sales representative held out the product to have limited and/or rare side effects that were minimal in nature.

26. Plaintiff volunteered to be the first subject to use the product.

27. The product produced minimal results at eliminating Plaintiff's excess body fat.

28. The product did cause Plaintiff excessive pain and discomfort and rendered portions of her body numb.

29. This is a violation of the contract's implied warranty of fitness for a particular purpose as defined under Rev.C.1302.28.

30. Because Defendant breached the implied warranty of fitness for a particular purpose, Plaintiff is entitled to damages or rescission of the contract in its entirety.

31. A copy of the sales agreement entered into between Plaintiff and Defendant is attached to this Complaint as Plaintiff's Exhibit A.

## COUNT THREE – DECLARATORY JUDGMENT

32. Plaintiff incorporates paragraphs 1 – 28 as if fully written here.

33. Plaintiff's purchase agreement with Defendant contains a forum selection clause.

34. The forum selection clause specifies that all disputes arising out of the agreement should be subject to California law and resolved in the State of California.

35. The forum selection clause is unconscionable and unenforceable under the Ninth District's decision in *Eagle v. Fred Martin Motor Co.*, 157 Ohio App. 3e 150, 809 N.E.2d.1161 (9th Dist. 2004).

36. The forum selection clause is substantively unconscionable due to Defendant conducting business in Ohio, attempting to require Plaintiff (an Ohio citizen) to resolve the dispute in California, and the subject matter of this dispute is located in Ohio.

37. Furthermore, Plaintiff is a medical doctor working as a sole practitioner in the field of general medicine and requiring her to leave Ohio for an uncertain amount of time would render her patients without adequate medical card and her employees without a source of income for the duration of the dispute.

38. The forum selection clause is procedurally unconscionable because Defendant's agent made false misrepresentations about the product to Plaintiff that Plaintiff relied on which cannot lead to a mutual meeting of the minds.

39. Because the forum selection clause is unconscionable and unenforceable, it should not be enforced under Ohio law and this court should retain jurisdiction of all of Plaintiff's claims.

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants as follows:

1. General damages significantly in excess of $25,000.

2. Special damages significantly in excess of $25,000.

3. Rescission of the contract in its entirety;

4. Declaratory judgment in Plaintiff's favor;

5. Reasonable attorney's fees and costs;

6. Such other relief that the Court deems just and equitable.

Respectfully submitted,

_____
JOHN BROOKS CAMERON (0055800)
CHRISTOPHER JANKOWSKI (0084129)
John Brooks Cameron & Associates
247 East Smith Rd.
Medina, OH 44256
P: 330-722-8989
F: 330-722-5877
attorney@johnbrookscameron.com
*Attorneys for Plaintiff*

## JURY DEMAND

In accordance with Rule 38 of the Ohio Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

_____
JOHN BROOKS CAMERON (0055800)
CHRISTOPHER JANKOWSKI (0084129)

## CERTIFICATE OF SERVICE

I certify that the foregoing Plaintiff's Complaint was sent this 24th day of September, 2015 via the Court's electronic filing system, unless otherwise stated, to:

**Dennis J. Hollahan**
Lewis, Brisbois, Bisgaard & Smith, LLP
333 Bush St., Suite 1100
San Francisco, CA 94104-2872
*Counsel for Defendant*

John Brooks Cameron
Christopher Jankowski



master sales agreement

# Master Sales Agreement
# Sales Order

**ZELTIQ**
4698 Willow Road
Pleasanton, CA 94588 USA
Phone: 1-888-ZELTIQ-1 Fax: 925-474-8071

**Bill to**
Luan O'Connor, MD
Luan O'Connor
111 W Reagan Pkwy
Medina, OH 44256
USA

**Ship to**
Luan O'Connor, MD
Luan O'Connor
111 W Reagan Pkwy
Medina, OH 44256
USA

**Information**
| | |
|---|---|
| Quotation Number | 44145 |
| Document Date | 10/28/2014 |
| Customer Code | |
| Sales Quotation Amount | USD 119,919.50 |
| Contact Name: | Luan O'Connor |
| Sales Employee: | Angela Belner |
| Valid Until: | |
| Payment Terms: | Prepaid |

| # | Item | Material/Description | Quantity | List Price | Sales Price | Total Amount |
|---|---|---|---|---|---|---|
| 1 | CoolSculpting System | CoolSculpting Control Unit - Qty 1.00<br>CoolSmooth Applicator - Qty 1.00<br>CoolCore Applicator - Qty 1.00<br>CoolCurve+ Applicator - Qty 1.00<br>CoolFit Applicator - Qty 1.00<br>CoolMax Applicator - Qty 1.00 | | | USD 109,000.00 | USD 101,000.00 |
| 2 | BRZ-RP1-08X-016 | CoolCard Max Pack - 16 Cycle | 1.00 | USD 8,800.00 | USD 4,400.00 | USD 4,400.00 |
| 3 | BRZ-RP1-06X 024 | CoolCard Pack - 24 Cycle | 1.00 | USD 6,000.00 | USD 3,000.00 | USD 3,000.00 |
| 4 | BRZ-RP1-KIT-US | CoolSculpting Country Kit - US | 1.00 | USD 300.00 | USD 0.00 | USD 0.00 |
| 5 | BRZ-SUP-PCK-C01 | CoolSculpting Support Pack | 1.00 | USD 300.00 | USD 0.00 | USD 0.00 |
| 6 | BRZ-RP1-09X-024 | CoolSmooth Card Pack - 24 Cycle | 1.00 | USD 6,000.00 | USD 3,000.00 | USD 3,000.00 |
| 7 | BRZ-PEP-PCK | Practice Enhancement Pack | 1.00 | USD 500.00 | USD 0.00 | USD 0.00 |
| 8 | BRZ-TRA-CSU-001 | CoolSculpting University Tuition | 1.00 | USD 1,500.00 | USD 0.00 | USD 0.00 |

FREE 2ND YEAR WARRANTY

| | |
|---|---|
| Subtotal | USD 111,400.00 |
| Shipping | USD 1,000.00 |
| Tax* | USD 7,519.50 |
| Total Amount | USD 118,919.50 |

*Final tax to be calculated upon invoicing

Accepted and Agreed:
Customer:                                              Zeltiq Aesthetics, Inc.
Signature:                                             Signature:
Name:                                                  Name:
Title:                                                 Title:
Date:                                                  Date:

Included Terms and Attachments. The agreement between Customer and ZELTIQ Aesthetics regarding the products described above (the "Master Sales Agreement") includes this Sales Order and the attachments (A-C) hereto which are incorporated herein in their entirety by this reference.

SL11912-Q

ZELTIQ Aesthetics, Inc. ("ZELTIQ")
4698 Willow Road, Pleasanton, CA 94588
Tel: (925) 474-8160 Fax: (925) 474-8071

## Attachment A: Terms & Conditions of Sale

**SCOPE OF AGREEMENT.**

These Terms and Conditions of Sale (the "Terms and Conditions"), together with the Sales Order to which it is attached ("Sales Order") and the Service, Warranty, and Extended Warranty Terms and Conditions in Attachment C ("Service Terms"), constitute the "Master Sales Agreement" (referred to as the "Agreement" or "Sales Agreement" herein) between the parties. This Agreement sets forth the terms and conditions for sale to Customer (as identified in the Sales Order) by ZELTIQ of the ZELTIQ CoolSculpting (Breeze) System (the "System"), The ZELTIQ Applicator(s) (the "Applicator(s)"), as well as ZELTIQ consumables as listed in Attachment B ("Supplies"). Systems and Supplies are referred to below individually and collectively as "Products." No inconsistent or additional terms of any Customer purchase order will become part of the Agreement and ZELTIQ hereby expressly rejects any and all such terms.

**AUTHORIZED USE.**

Use of the Products is permitted only for individuals who are: (i) authorized to treat patients, as defined by the applicable state medical review board in the jurisdiction in which the System is operated, or, (ii) under the supervision of such licensed physicians.

The Customer is responsible to ensure that all operators have the requisite skill required to use the Products as defined by the applicable state medical review board in the jurisdiction in which the System is operated. Customer will, at all times, ensure that it and its employees and agents are and remain in full compliance with all federal, state, and local laws and statutes, including without limitation state medical agencies and certification boards, relating to this Agreement or the Products or their use.

The Customer acknowledges that proper operation of the System requires use of supplies specifically engineered to meet ZELTIQ's compatibility, quality and performance standards, and accordingly agrees to use Supplies provided by or expressly authorized by ZELTIQ. Customer use of Supplies not provided or expressly authorized by ZELTIQ will void all warranties and extended warranties on the System.

The Customer will ensure and represents and warrants that any operators of the Products will comply with all terms and conditions of this Agreement and all Documentation in their use of the Products, and Customer shall be fully liable to ZELTIQ for any improper or unauthorized use of the Products by any such operator.

**TERM OF RIGHT TO PURCHASE.**

Customer may purchase Products under this Agreement at the prices set forth in the Sales Order for a limited-time as indicated in the Sales Order as valid until ("Order Period"). The right to purchase Product at such prices ceases when the applicable Order Period expires. If the parties mutually agree that Customer may purchase Products notwithstanding such expiration, then the parties may choose to do so, and any such purchase shall be subject to the terms of this Agreement.

**PRODUCTS PROVIDED AND PRICE.**

Products provided under this Agreement are new unless indicated otherwise on the Sales Order. However, such Products may contain components that have been previously used in other Product units. Products that contain such previously used components meet or exceed ZELTIQ's specifications for newly manufactured Products. Prices and orders do not include national, state or local excise, sales, use, value added or other taxes now or hereinafter enacted ("Taxes"). When such Taxes apply and ZELTIQ has the legal obligation to collect any such Taxes, then those Taxes may be included in the amount invoiced to Customer, unless Customer provides ZELTIQ with a valid tax exemption certificate. If ZELTIQ is required to pay any such Taxes in connection with the sale (at the time of sale or thereafter), then Customer shall reimburse ZELTIQ for all amounts paid for such Taxes. ZELTIQ reserves the right to modify the Products, to make substitutions and modifications of the specifications of the Product, or to replace the Products with other Products, as it deems necessary or appropriate. If the Product is at Customer's location, then Customer shall make the Product reasonably available for any modifications or replacements required by ZELTIQ. Modifications to or replacements of the Product that are required by ZELTIQ after delivery to Customer will be done at ZELTIQ's expense. ZELTIQ reserves the right not to provide Products to any entity or person that ZELTIQ reasonably believes is using or intends to use the Products in violation of the terms of this Agreement, including the restrictions set forth above.

**FUTURE PRODUCT PURCHASES.**

By placing an order with ZELTIQ or otherwise requesting Products, Customer accepts that the then-current Terms and Conditions (including the applicable Attachments) shall govern all future purchases. The then-current Terms and Conditions are available for view on CoolNet (www.coolsculpting.com). The then-current Terms and Conditions (including the applicable Attachments) located on CoolNet shall contain the entire understanding of the parties with respect to the purchase of Products upon the date of purchase and supersedes and replaces in its entirety any and all prior communications and contemporaneous agreements and understandings, whether oral, written, electronic or implied, if any, between the parties with respect to the subject matter hereof.

**SHIPMENT SCHEDULES.**

ZELTIQ will use commercially reasonable efforts to meet shipment schedules. However, any shipment date or forecast on an order acknowledgment is only an estimate of the time required to make shipment. ZELTIQ will not be liable to Customer or any third party for any loss, damages or penalty resulting from delay in delivery of the Products for any reason, including without limitation, supplier delay, force majeure, act of God, labor unrest or dispute, shortage of materials, war, insurrection, fire, explosion, acts of terrorism or earthquake. In any such event, the delivery date will be deemed extended for a period equal to the delay. ZELTIQ reserves the right to allocate inventories and production in its sole discretion.

**TRANSPORTATION AND RISK OF LOSS.**

Unless otherwise set forth on the Sales Order, the terms of transportation and delivery are FOB at the point of origin, subject to the terms set forth below. Prices include the cost of packaging for normal shipment, and do not include freight, which must be paid by Customer. Risk of loss for damage passes to Customer at the point of origin, whether or not installation is provided by ZELTIQ. Upon shipment of each System the title transfers and is considered accepted by the Customer when the shipment is made.

**PACKAGING.**

ZELTIQ has developed special shipping containers for delivery of the Products. These containers are the property of ZELTIQ and, unless otherwise agreed in writing by the parties, must be returned to ZELTIQ at ZELTIQ's expense upon completion of installation or service of the Products.

**PAYMENT TERMS AND OTHER RIGHTS OF ZELTIQ.**

Except to the extent otherwise expressly stated on the Sales Order or authorized by ZELTIQ in writing, pre-payment of the full purchase price of the Products is due prior to shipment. Payments must be made to ZELTIQ at its principal office in Pleasanton, California, or such other office as designated on the Sales Order. Payment must be made in U.S. dollars by credit card, by wire transfer, or by check. ZELTIQ reserves the right to require alternative payment terms, including, without limitation, cash on delivery ("C.O.D.") or letter of credit.

If Customer fails to make any payment as in accordance with this Agreement, or if Customer is or becomes delinquent in the payment of any sum due ZELTIQ (whether or not arising out of this Agreement) or refuses to accept C.O.D. shipment terms, then ZELTIQ may, in addition to any other remedy to which it may be entitled in law or equity, cancel any or all Sales Orders and/or refuse to make further deliveries. Partial shipments made under any Sales Order will be treated as separate transactions and payment must be made accordingly on each such partial shipment. ZELTIQ reserves a purchase money security interest in the Products and the proceeds thereof, in the amount of the purchase price, until ZELTIQ has received full payment. A copy of the invoice or other documents may be filed with appropriate authorities at any time as a financing statement and/or chattel mortgage to perfect ZELTIQ's security interest. Customer will cooperate fully with ZELTIQ to execute such other documents and to accomplish such filings and/or recordings thereof as ZELTIQ may deem necessary for the protection of ZELTIQ's interests in the Products furnished hereunder. ZELTIQ shall be authorized to: (i) charge Customer's credit card on file for the full amount due ZELTIQ following the day the payment became delinquent; or (ii) charge interest on overdue invoices at the rate of one and one-half percent (1.5%) per month, or the maximum amount allowed by law, (whichever is less) on the unpaid balance from the original due date of the invoice. Customer, at its expense, shall fully insure Products against all loss or damage until ZELTIQ has been paid in full therefore. If Customer defaults on any of its payment obligations to

SL11912-Q

ZELTIQ under this Agreement and does not cure such default within five (5) business days following Customer's receipt of written notice thereof from ZELTIQ, Customer expressly agrees that, in addition to any other remedies available to ZELTIQ under applicable law, ZELTIQ may repossess the Products without liability to Customer. In that event, Customer shall make such Products available to ZELTIQ so that ZELTIQ can repossess such Products without a breach of the peace.

Customer hereby agrees that Customer will not sell the System to a third party unless such third party has been trained and certified by ZELTIQ to use the System. In the event that Customer sells the System to a third party, Customer will promptly provide to ZELTIQ the name and contact information of such third party.

### EQUIPMENT LEASE OR FINANCING.

Customer may enter into a lease agreement with a leasing or finance company, and the terms thereof are solely between Customer and that third party. The terms of any agreement between customer and any third party leasing or finance company, including the terms set forth in any purchase order submitted to ZELTIQ by such leasing or finance company shall have no effect on the terms of this Agreement. If Customer elects to lease the Products, then the terms and conditions of this Agreement shall apply solely to such transaction despite any additional or inconsistent terms provided by the third party leasing or finance company. Any leasing or finance arrangement is conditional upon ZELTIQ's approval of the leasing arrangement and the leasing company's full payment of the purchase price of the Products and shall not modify this Agreement in any way or relieve Customer of any obligations under this Agreement. If the leasing or finance company fails timely to pay ZELTIQ the purchase price of the Products, Customer agrees to pay to ZELTIQ the unpaid portion of the purchase price upon written demand from ZELTIQ.

### PRODUCT WARRANTY.

See Attachment C for ZELTIQ's Service, Warranty, and Extended Warranty Terms and Conditions that are applicable to the Products.

### DEFENSE AGAINST CLAIMS OF INFRINGEMENT.

ZELTIQ will defend Customer at ZELTIQ's expense, as set forth herein, against any claim by a third party that the design or manufacture of any standard Product furnished hereunder constitutes an infringement of an issued U.S. patent or U.S. copyright. Customer will notify ZELTIQ promptly in writing of any such claim of infringement and shall give ZELTIQ full authority, information and assistance in settling or defending such claim. ZELTIQ has no liability whatsoever with respect to any claims settled by Customer without ZELTIQ's prior written consent. ZELTIQ has no liability to Customer under any provision of this section if any patent infringement or claim thereof is based upon the use of the Product as modified by any person other than ZELTIQ or in combination with equipment or devices not made by ZELTIQ, or in a manner that does not comply with the requirements of this Agreement or the documentation applicable to the Product. If, with respect to any such claim, the use of the Products is, or ZELTIQ determines such use is likely to be, enjoined, then within a reasonable time after such injunction (or determination by ZELTIQ, if applicable), ZELTIQ shall, at its option (i) secure for Customer the right to continue using the Products, or (ii) at ZELTIQ's expense, replace the Products with non-infringing goods, or (iii) remove the applicable Products and refund a pro rata portion of the sums paid therefore, based on four-year straight line depreciation. ZELTIQ's obligations in this paragraph shall not apply to any equipment, device or parts not manufactured by ZELTIQ. THE FOREGOING STATES ZELTIQ'S ENTIRE LIABILITY AND OBLIGATION (EXPRESS, STATUTORY, IMPLIED OR OTHERWISE), AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDY, WITH RESPECT TO INFRINGEMENT CLAIMS ARISING FROM OR RELATED TO THIS AGREEMENT.

### PROPRIETARY RIGHTS.

The sale of the Products hereunder to Customer does not and will not be deemed to confer upon Customer any right, interest or license in any patents, patent applications, copyrights, trade secrets or other proprietary rights that ZELTIQ may have covering the Products, other than the right to use the Products in accordance with this Agreement. ZELTIQ retains ownership of all proprietary rights in and to the Products and related documentation and all designs, engineering details, and other data and materials pertaining to any Products and to all discoveries, inventions, patents and other proprietary rights arising out of the work done by ZELTIQ in connection with the Products or with any and all products developed by ZELTIQ as a result thereof, including the sole right to manufacture any and all such products. Customer shall not divulge, disclose, or in any way distribute or make use of such information supplied to Customer by ZELTIQ. Customer shall not manufacture or have manufactured the Products in whole or in part. All software and firmware in the Products ("Software") is owned by ZELTIQ or its licensors and notwithstanding anything expressed or implied in this Agreement, the Software is licensed to, and not sold to Customer, pursuant to the license set forth below. Any references to "sale" or "purchase" in this Agreement with respect to the Software mean the sale or purchase of such license to the Software. Subject to Customer's compliance with this Agreement, ZELTIQ grants Customer a personal, non-exclusive, non-transferable (with no right to sublicense) license to use the Software solely in connection with the authorized use of the Products in accordance with this Agreement. Customer may not sell, rent, lease, or otherwise transfer Products for use by any third party unless the proposed transferee has entered into a separate written agreement for such Products with ZELTIQ. Except where such restriction is prohibited by law and cannot be waived by Customer, Customer will not reverse engineer or otherwise attempt to derive or obtain information about the functioning of the Product, or the source code of the Software, to the extent such information and/or source code is not generally made available to end users by ZELTIQ.

### TRADEMARKS.

Upon completion of training, Customer shall become an authorized provider of ZELTIQ Products and authorized in connection therewith to use the ZELTIQ Marks solely in its promotion and delivery of services utilizing ZELTIQ Products, and in accordance with any guidelines provided by ZELTIQ. However, ZELTIQ strictly prohibits Customers from purchase and/or use of internet domain(s) consisting of or incorporating any of the ZELTIQ Marks. Customer agrees not to purchase and/or use internet domain(s) consisting of or incorporating any of the ZELTIQ Marks. Customer agrees to incorporate the then-current ZELTIQ branding on their website within thirty (30) days from delivery of the System. Customer acknowledges ZELTIQ's exclusive ownership of the ZELTIQ Marks and that its use thereof inures solely to ZELTIQ's benefit. Customer shall not attempt to obtain registration of any ZELTIQ Mark, and shall not debrand, rebrand or private label any ZELTIQ Product or service.

### CERTIFICATION.

Customer agrees to initiate ZELTIQ's CoolSculpting Certification Program ("Program") within thirty (30) days from the delivery of the System. The Program must be completed within five (5) months of the Program start date.

### LIMITATIONS OF LIABILITY.

ZELTIQ'S LIABILITY ARISING FROM OR RELATED TO THIS AGREEMENT AND/OR SALE OR USE OF THE PRODUCTS (REGARDLESS OF THE THEORY OF DAMAGES OR LEGAL THEORY, WHETHER CONTRACT, TORT, NEGLIGENCE, WARRANTY OR OTHERWISE) WILL BE LIMITED, (I) WITH RESPECT TO WARRANTY CLAIMS AS SET FORTH IN THE WARRANTY SECTION, AND (II) WITH RESPECT TO ANY OTHER CLAIM TO THE AMOUNT OF THE PURCHASE PRICE FOR THE PRODUCT IN QUESTION. IN ADDITION TO THE ABOVE LIMITATIONS OF LIABILITY, ZELTIQ WILL NOT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES, OR FOR ANY LOST PROFITS, LOST REVENUE OR LOSS OF USE ARISING FROM OR RELATED TO THIS AGREEMENT AND/OR SALE OR USE OF THE PRODUCTS. TRAINING MATERIALS, DOCUMENTATION OR OTHERWISE, REGARDLESS OF THE THEORY OF DAMAGES OR LEGAL THEORY (WHETHER CONTRACT, TORT, NEGLIGENCE, WARRANTY OR OTHERWISE) AND WHETHER OR NOT ZELTIQ HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED WARRANTY. THE FOREGOING LIMITATION OF LIABILITY PROVISION SHALL BE APPLICABLE AND ENFORCED TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW.

### TERMINATION OF USE.

Customer acknowledges that its use of the System (including the Software) is subject to compliance with the usage and other requirements described in this Agreement (including, without limitation, the "Authorized Use" provisions above). Customer's authorization to operate the System and license to the Software will terminate automatically in the event Customer fails to comply with such requirements. In such event, in addition to any other remedies available to ZELTIQ under applicable law, Customer expressly agrees that ZELTIQ will have the right to cease selling Products to the Customer, including but not limited to Supplies.

### NO WAIVER; NO ASSIGNMENT; SEVERABILITY OF TERMS.

No forbearance by ZELTIQ with respect to any default by Customer will constitute or be deemed a waiver unless such waiver is in writing and signed by ZELTIQ. No waiver of any default will constitute or be deemed a waiver of any future default or performance, or a waiver of default or performance under another provision of this Agreement. Customer may not assign this Agreement (whether by operation or law or otherwise) without the prior written consent of ZELTIQ, and any attempted assignment in violation of the foregoing shall be null and void. If any provision of this Agreement, or the application of a provision, is for any reason or in any event found to be invalid or unenforceable, then the remainder of this Agreement (and the remainder of the provision, to the extent possible) will remain in full force and effect and be interpreted so as best to reasonably effect the intent of the parties.

### APPLICABLE LAW; DISPUTE RESOLUTION.

SL11912-Q

The laws of the State of California govern this agreement without regard to conflict of laws principles or any other principles that would result in the application of a different body of law. The United Nations Convention on Contracts for the International Sale of Goods is expressly excluded from this Agreement. Any controversy or claim arising out of or relating to this Agreement, or its breach, shall be subject to non-binding mediation prior to binding arbitration in Alameda County, California under the then-current Commercial Arbitration Rules of the American Arbitration Association by one arbitrator appointed in accordance with such Rules. The arbitrator shall issue a written report to the parties, detailing the basis of any arbitration award. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction. Subject to the parties' obligation to submit disputes to binding arbitration in accordance with this paragraph, the California state courts of Alameda County, California (or if there is federal jurisdiction, the United States District Court for the Northern District of California) have exclusive jurisdiction and venue over any dispute arising from or related to this Agreement. Customer hereby, irrevocably, consents to the jurisdiction of such courts, and waives any objection thereto. Notwithstanding the foregoing, neither party shall be precluded, at any time, from seeking injunctive relief or other provisional relief, or submitting any decision of an arbitrator reached in accordance with this paragraph, in any court of law in connection with the enforcement of this Agreement or such party's intellectual property rights.

## MISCELLANEOUS.

The relationship between ZELTIQ and Customer under this Agreement is solely that of independent contractors, and no partnership, agency employment, franchise, joint venture, or other relationship is created hereunder. ZELTIQ reserves the right to collect system usage data from time to time for the purpose of running diagnostics and improving usability and performance of the system. Data collected will not contain any patient identification information. This Agreement sets forth the entire agreement between ZELTIQ and Customer regarding the Products purchased by Customer hereunder and it expressly supersedes any other agreements, oral or written, regarding the subject matter hereof.

End of Terms and Conditions

## ZELTIQ Aesthetics, Inc. ("ZELTIQ")
### 4698 Willow Road, Pleasanton, CA 94588
### Tel: (925) 474-8160 Fax: (925) 474-8071

## Attachment C: Service and Warranty Terms and Conditions

### PRODUCT LIMITED WARRANTY

**Control Unit Warranty.** The warranty period for the Product control unit ("Control Unit") shall be one (1) year from the date of shipment. ("Standard Control Unit Warranty Period"). ZELTIQ warrants to Customer during the Standard Control Unit Warranty Period that the Control Unit will be free from material defects in materials and workmanship and will substantially conform to ZELTIQ's written specifications applicable to the Control Unit as such specifications exist on the date of shipment ("Control Unit Warranty")

**Applicator Warranty.** The warranty period for the Product applicator ("Applicator(s)") shall be one (1) year from the date of shipment ("Standard Applicator Warranty Period"). ZELTIQ warrants to Customer during the Applicator Warranty Period that the Applicator(s) will be free from material defects in materials and workmanship and will substantially conform to ZELTIQ's written specifications applicable to the Applicator(s) as such specifications exist on the date of shipment ("Applicator Warranty").

**Extended Warranty for Control Units and Applicators.** Customer may purchase extended warranty coverage in one (1) year increments for Control Units and Applicators at ZELTIQ's then-current terms and pricing for such coverage ("Extended Warranty"), which coverage, if purchased by Customer, shall begin at the end of the Standard Control Unit and Applicator Warranty Period ("Extended Control Unit and Applicator Warranty Period"). Customer must purchase the initial year of the Extended Warranty with respect to a Control Unit and each associated Applicator(s) before the expiration date of the then-current Control Unit and Applicator Warranty Period, and must purchase an additional year(s) of any Extended Warranty prior to the expiration of the initial year of the Extended Warranty period. ZELTIQ may determine in its sole discretion whether to provide an Extended Warranty with respect to a Control Unit or Applicator after the expiration of the Control Unit and Applicator Warranty Period, in which case the Customer will be subject to on-site inspection charges. Non-conforming Control Units and Applicators must be fully repaired to meet ZELTIQ's then-current specifications and standards at Customer's cost and expense prior to the sale and activation of an Extended Warranty for such Control Units and/or Applicators. Customer shall be responsible for and shall pay all inspection, shipping and repair costs associated with such Extended Warranty purchase. Upon ZELTIQ's request, Customer shall pre-pay for any inspection or repair services. Unless otherwise specified by ZELTIQ prior to the beginning of an Extended Control Unit or Applicator Warranty Period, the terms of the Extended Warranty will be the same as the terms of the warranty described in the paragraph above. For clarity, ZELTIQ may decline to offer Extended Warranty coverage with respect to any Product for any reason.

**EZ Card Warranty.** The warranty period for the replaceable cards associated with the Control Unit and Applicator ("EZ Cards") shall be for the useful life of replaceable cards, which period shall begin on the date ZELTIQ ships the applicable EZ Cards to Customer (the "EZ Card Warranty Period"). ZELTIQ warrants to Customer during the EZ Card Warranty Period that the applicable EZ Cards will be free from material defects in materials and workmanship and will substantially conform to ZELTIQ's written specifications applicable to the EZ Card as such specifications exist on the date of shipment ("EZ Card Warranty").

**Software Updates.** During the Control Unit Warranty and the Applicator Warranty Period and any Extended Control Unit and Applicator Warranty Period, ZELTIQ shall make available to Customer, at no additional charge, all bug fixes and error corrections for the software for the Control Units and Applicators that ZELTIQ makes generally commercially available at no additional charge to other customers in the Territory receiving such warranty services.

### RETURN MATERIAL AUTHORIZATION

**RMA Number.** No Product returned for any service or warranty will be accepted by ZELTIQ unless a Return Material Authorization ("RMA") number has been previously obtained from ZELTIQ's Customer Service Department.

**RMA Procedure.** In the event of a breach of the Control Unit Warranty, the Applicator Warranty, the EZ Card Warranty, or the Extended Control Unit and Applicator Warranty, ZELTIQ shall, at its option and expense, either: (i) accept return of the defective Product and repair or have repaired the defective Product (and provide a substantially similar loaner Product during such repair in the case of Control Unit and Applicator repairs), or (ii) accept return of the defective Product and provide a replacement Product to Customer. Replacement Product(s) may consist of refurbished components. All freight expenses associated with the shipment of defective Product are the sole responsibility of ZELTIQ. Customer must obtain an RMA number from ZELTIQ prior to returning any Product to ZELTIQ and must otherwise follow ZELTIQ's then-current RMA procedure in connection with any such return. If ZELTIQ determines in its reasonable discretion that any Product returned by Customer conforms to the applicable warranty ("Non-Defective Products"), ZELTIQ will notify the Customer of such and will return the applicable Product to Customer at Customer's expense. In addition, ZELTIQ may assess Customer a charge for testing and examination of Non-Defective Products. The repair or replacement of Products in accordance with this paragraph shall be ZELTIQ's entire liability and Customer's sole and exclusive remedy for ZELTIQ's breach of the Control Unit Warranty, Applicator Warranty, and the EZ Card Warranty.

### SERVICE QUOTATIONS.

**Quotations.** ZELTIQ will provide written quotations for all proposed service to ZELTIQ systems not covered under any warranty or extended warranty. Such quotations are provided by the ZELTIQ Customer Service Department at 4698 Willow Road, Pleasanton, CA 94588. All quotations are based on an inspection of the defective Product and are valid for thirty (30) days from date issued unless otherwise specified on the quotation. The limited warranty period on all such services performed will be ninety (90) days from the date of service.

### WARRANTY EXCLUSIONS AND LIMITATIONS

THE LIMITED WARRANTIES SET FORTH ABOVE ARE THE ONLY WARRANTIES MADE BY ZELTIQ WITH RESPECT TO THE PRODUCTS. NO REPRESENTATIVE OR PERSON IS AUTHORIZED TO BIND ZELTIQ FOR ANY OBLIGATIONS OR LIABILITIES BEYOND THE WARRANTIES IN CONNECTION WITH THE SALE OF THE PRODUCTS OR PERFORMANCE OF ANY RELATED SERVICES. THE WARRANTIES APPLY ONLY TO THE CUSTOMER WHO IS THE END USER AND THE ORIGINAL PURCHASER OF THE PRODUCTS, AND IS NOT TRANSFERABLE. THE WARRANTIES SHALL APPLY ONLY WHEN THE PRODUCTS ARE USED IN CONNECTION WITH AUTHORIZED SUPPLIES, ARE PROPERLY MAINTAINED, ARE USED BY TRAINED AND AUTHORIZED PERSONNEL, ARE USED IN A MANNER CONSISTENT WITH THEIR DOCUMENTATION, AND FOR THEIR INTENDED PURPOSE, AND ARE USED IN THE COUNTRY TO WHICH ZELTIQ ORIGINALLY SHIPPED THE PRODUCT. THE WARRANTIES DO NOT APPLY AND ARE VOID IF A PRODUCT HAS BEEN SUBJECTED TO IMPROPER OPERATION, HAS HAD UNAUTHORIZED REPAIR OR MODIFICATION (INCLUDING OF THE INCLUDED SOFTWARE), AND/OR HAS BEEN SUBJECTED TO NEGLECT OR ABUSE (INCLUDING MECHANICAL SHOCKS, FAILURE TO MAINTAIN THE SYSTEM, USING EXPIRED OR UNAUTHORIZED SUPPLIES, IMPROPER TRANSPORT, MECHANICAL OR ELECTRICAL SHOCK, OPERATION OUTSIDE OF ITS ENVIRONMENTAL SPECIFICATIONS AND OTHERWISE). THE WARRANTY ON ALL SERVICES PROVIDED UNDER THESE WARRANTY TERMS IS THE LONGER OF THE FOLLOWING PERIODS: (A) THE REMAINDER OF THE ORIGINAL WARRANTY PERIOD OR EXTENDED WARRANTY PERIOD; OR (B) NINETY (90) DAYS FROM THE DATE OF SUCH PRODUCT SERVICE.

### DISCLAIMER OF WARRANTIES

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ZELTIQ MAKES NO WARRANTIES, AND HEREBY DISCLAIMS ANY AND ALL OTHER WARRANTIES OF ANY NATURE, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGMENT. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE. ZELTIQ DOES NOT WARRANT THAT THE OPERATION OF THE PRODUCTS WILL BE UNINTERRUPTED OR ERROR FREE. ZELTIQ MAKES NO WARRANTIES OF ANY KIND REGARDING THE TRAINING OR TRAINING MATERIALS PROVIDED BY ZELTIQ OR ANY THIRD PARTY TRAINERS, NOR DOES ZELTIQ WARRANT THAT THE TRAINING MATERIALS OR ANY TRAINER'S CERTIFICATION CREDENTIALS COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS OR STATUTES.

United States Terms and Conditions of Sale (11/13)

SL11911-J



**ZELTIQ Aesthetics, Inc. ("ZELTIQ")**
4698 Willow Road, Pleasanton, CA 94588
Tel: (925) 474-8160 Fax: (925) 474-8071

### Attachment B: Supplies
Prices Subject to Change

| Item | Part Number | Description | Price |
|---|---|---|---|
| CoolCard Pack - 24 Cycle | BRZ-RP1-06X-024 | The CoolCard is a disposable cartridge that supplies cycles and profiles for the customer. To perform a CoolSculpting Procedure, the operator inserts the Card into the applicator. Includes (1) 24 cycle card, (24) gelpads, (16) liners, (50) CoolSculpting Patient Brochures | $3,000.00 |
| CoolLiner - Qty 16 | BRZ-LN1-06X-016 | The CoolLiner provides a clean surface for the patient and minimizes the spread of gel from the gelpad. For use with the CoolCurve and CoolCore applicators. Store the liners at room temperature. Includes sixteen (16) Liners. | Provided at no charge with CoolCard purchase; $320.00 sold separately |
| CoolGel - Qty 12 | BRZ-PD1-06X-012 | The CoolGel gelpad is a gel-soaked pad which provides consistent thermal coupling between the application site and the applicator during a CoolSculpting treatment. For use with the CoolCurve and CoolCore applicators. Includes twelve (12) gelpads. | Provided at no charge with CoolCard purchase; $240.00 sold separately |
| CoolCard Max Pack - 16 Cycle | BRZ-RP1-08X-016 | The CoolCard Max card is a disposable cartridge that supplies cycles and profiles for the customer. For use with the CoolMax applicator. To perform a CoolSculpting treatment, the operator inserts the card into the applicator. Includes (1) 16 cycle card, (16) gelpads, (16) liners and (50) CoolSculpting Patient Brochures | $4,400.00 |
| CoolLiner Max – Qty 8 | BRZ-LN1-08X-008 | The CoolLiner Max liner provides a clean surface for the patient and minimizes the spread of gel from the gelpad. For use with the CoolMax applicator. Includes eight (8) liners. | Provided at no charge with CoolCard Max purchase; $320.00 sold separately |
| CoolGel Max - Qty 8 | BRZ-PD1-08X-008 | The CoolGel Max gelpad is a gel-soaked pad which provides consistent thermal coupling between the application site and the applicator during a CoolSculpting treatment. For use with the CoolMax applicator. Includes eight (8) gelpads. | Provided at no charge with CoolCard Max purchase; $240.00 sold separately |
| CoolSculpting Patient Brochures | BRZ-RP1-BRO-001 | CoolSculpting Patient Brochures --includes twenty-five (25) brochures. | $15.00 |
| CoolSculpting Applicator Support Arm | BRZ-RP1-ARM-001 | The Applicator Support Arm | $140.00 |

SLI6514-B



## MINIMUM ADVERTISED PRICE POLICY
### Effective May 1, 2014

In establishing our Minimum Advertised Price Policy ("the Policy"), ZELTIQ® seeks to protect each of our customers' investment in the CoolSculpting® procedure and to maintain the value of our product's brand, trademark and trade name. ZELTIQ's Policy aims to maintain integrity and brand equity by emphasizing the value and quality of CoolSculpting through advertising and marketing efforts.

Policy Coverage: ZELTIQ is adopting this Policy unilaterally, and ZELTIQ will uniformly enforce the Policy for all customers who own or operate a CoolSculpting System. Each customer is free to establish the price they charge per treatment using the CoolSculpting System. ZELTIQ neither solicits, nor will it accept any assurance of compliance with this Policy. Nothing in this Policy or in any other contract or agreement with ZELTIQ shall constitute an agreement between ZELTIQ and the customer that the customer will comply with this Policy. ZELTIQ is not seeking agreement from any customers to adhere to this Policy. It is entirely within the discretion of the customer whether to comply or not to comply with this Policy.

Minimum Advertised Price ("MAP"): The MAP per treatment using the CoolSculpting system is defined as follows:

- $600 per treatment cycle (except with CoolMax™, aka eZ App 8) for any package pricing less than 8 cycles. For packages of 8 or greater cycles, the average price per treatment cycle must be at least $500*.
- $1,200 per treatment cycle for CoolMax for any package pricing less than 8 cycles. For packages of 8 or greater cycles, the average price per treatment cycle must be at least $1,000*.

*To comply with MAP's package (multiple cycle) pricing, the advertisement must only reference the total value of the package and the number of cycles. For example, "$4,000 for 8 cycles" is an acceptable promotion whereas; "$500 per cycle when you purchase 8 cycles" is not acceptable.

When price is included in advertising, it must be prominent and clear to the consumer. For percentage discounts and/or "buy one get one" offers, the advertised price will be calculated assuming a list price of $800 per cycle with applicators other that CoolMax and $1,500 per cycle for CoolMax. If the calculated advertised price falls below MAP policy pricing, it would not be in compliance with this policy. The minimum advertised price per procedure may be adjusted from time to time at ZELTIQ's sole discretion. Competitive statements such as or similar to "will beat any advertised price" or "lowest price guaranteed" will be considered inconsistent and not in compliance with the Policy.

This Policy applies to all advertisements of CoolSculpting treatments that are made over the phone and in all media, including and without limitation: flyers, posters, coupons, mailers, inserts, newspapers, magazines, catalogs, mail order catalogs, internet or similar electronic media, television, radio and public signage. Non-compliance with this policy includes participation in social coupons and discount sites (such as, but not limited to Groupon, Living Social or Gilt). Resell or transfer of consumables to a third party is a violation of this policy.

Policy Compliance: Customers in compliance with this Policy will receive a fifty percent (50%) discount off the list price of the consumables purchased during the period of their compliance as defined below. This Policy and any customer's eligibility for the discount are determined at the sole discretion of ZELTIQ and subject to change. The discounted consumable prices are:

|  | List Price: | Discounted Price: |
|---|---|---|
| CoolCard (small): | $6,000 | $3,000 |
| CoolCard Max: | $8,800 | $4,400 |

Compliance with this Policy shall be determined by ZELTIQ in its sole discretion and judgment. ZELTIQ will not accept any communication from any customer whom ZELTIQ has determined is in violation of or has violated this Policy, regarding the violation(s) itself or the willingness of the customer to comply with the Policy in the future.

Failure to adhere to this Policy may result in the customer (i) forfeiting all or a portion of the discount, (ii) being removed from ZELTIQ's Physician Locator and/or (iii) being removed from or deemed ineligible for the Crystal Rewards Program. ZELTIQ also reserves the right to stop supplying CoolCards to any customer who is in violation of this Policy.

Policy Modification: ZELTIQ reserves the right at any time to modify, suspend or discontinue this Policy in whole or in part, or to designate promotional periods during which the terms of the Policy change or designate periods of time during which the Policy is not applicable.

Contact Information: ZELTIQ SALES PERSONNEL HAVE NO AUTHORITY TO MODIFY OR GRANT EXCEPTIONS TO THIS POLICY.

SL18678-A